COMPLAINT FORM
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **LAURA RAPP,** ) | Case Type: Malpractice |
| ) | |
| **LAURA RAPP AS FORMER PERSONAL** ) | |
| **REPRESENTATIVE OF THE ESTATE OF** ) | |
| **LAURENCE A. BERG,** ) | Case No.:__17-cv-948___ |
| ) | Judge:_____ |
| Plaintiffs, ) | |
| ) | **COMPLAINT** |
| ) | |
| ) | JURY TRIAL DEMANDED |

         v.

**ANDREW LAUFERS,** )
**12954 Eagle Bluff Drive, Burnsville,** )
**Minnesota 55337,** )
    )
**KATHERINE BROWN HOLMEN** )
**3590 Birch Pond Road, Eagan,** )
**Minnesota 55122,** )
    )
**DUDLEY AND SMITH, P.A.** )
**c/o Joseph J. Dudley, Jr.** )
**101 East 5th Street, Suite 2602** )
**Saint Paul, MN  55101,** )
    )
**JOHN DOE #1, Address Unknown** )
    )
**JOHN DOE #2, Address Unknown** )
    )
**JOHN DOE #3, Address Unknown** )
    )
**JOHN DOE #4, Address Unknown** )
    )
**JOHN DOE #5, Address Unknown** )

              **Defendants.**

## A. **PARTIES**

1. Plaintiff Laura A. Rapp is a citizen of California and resides at 144 Corte Anita, Greenbrae, California 94904.  Laura Rapp was previously a resident of Austin, Texas.

2. Plaintiff Laura A. Rapp, former personal representative of the Laurence A. Berg Estate, is a citizen of California and resides at 144 Corte Anita, Greenbrae, California 94904.  Laura Rapp was previously a resident of Austin, Texas.

3. Defendant Andrew J. Laufers is a citizen of Minnesota and resides at 12954 Eagle Bluff Drive, Burnsville, Minnesota 55337.  Andrew Laufers worked for Dudley and Smith, PA, 101 East 5th Street, Suite 2602, Saint Paul, Minnesota 55101, and is now employed by Cordell and Cordell, 7701 France Avenue South, Suite 375, Edina, Minnesota 55435.

4. Defendant Katherine A. Brown Holmen is a citizen of Minnesota and resides at 3590 Birch Pond Road, Eagan, Minnesota 55122.  Katherine Brown Holmen worked for Dudley and Smith, PA, and continues to be employed by Dudley and Smith, PA, 101 East 5th Street, Suite 2602, Saint Paul, Minnesota  55101

5. Defendant Dudley and Smith, PA is a law firm, c/o Joseph J. Dudley, Jr., operating at 101 East 5th Street, Suite 2602, Saint Paul, Minnesota  55101

6. John Doe #1 – Address Unknown

7. John Doe #2 – Address Unknown

8. John Doe #3 – Address Unknown

9. John Doe #4 – Address Unknown

10. John Doe #5 – Address Unknown

## B. **STATEMENT OF CLAIM**

Plaintiff Laura A. Rapp, as an individual, and Plaintiff Laura A. Rapp, as the former

Personal Representative of the Laurence A. Berg Estate, for their cause of action

against Defendants alleges that, upon personal knowledge as to themselves, and upon

information and belief that:

This case involves the unfortunate fallout from the attempted settlement of the Estate of Laurence A. Berg (hereinafter "Berg Estate"). Laurence Berg, Vicki Garves-Berg, and Brett Weller died in a plane crash in Menomonie, Wisconsin, pursuant to Vicki Garves-Berg's return from a business trip to Sheboygan, Wisconsin on behalf of Vicki Garves-Berg's business, Vital Anesthesia Associates, Ltd. What followed the attempted settlement was a doomed attempt to undo Attorney Andrew J. Laufers' (hereinafter "Laufers"), Attorney Katherine Brown Holmen's (hereinafter "Brown Holmen"), and Dudley and Smith, PA's (hereinafter "Dudley") mistakes, which have imposed and continue to impose financial and emotional distress on Laura Rapp, individually, and Laura Rapp, as the former personal representative of her brother Laurence Berg's estate (collectively hereinafter "Plaintiff Rapp" or "Rapp"). The Berg Estate is an estate which is being probated in the State of Wisconsin and one for which this former out-of-state personal representative's bond remains outstanding. Plaintiff Rapp's bond remains the subject of litigation though the date of this filing. Additionally, a contempt of court claim against Plaintiff Rapp is also outstanding but is stayed pending the outcome of the claim against the bond.

Since signing the aforementioned January 10, 2012, Settlement Agreement (hereinafter "Settlement Agreement"), which Laufers, Brown Holmen, and Dudley advised Plaintiff Rapp to sign, Plaintiff Rapp has been continually subjected to Berg Estate-related and plane crash-related litigation, ongoing legal expenses, and severe financial and emotional distress. Laufers, Brown Holmen, and Dudley advised Plaintiff Rapp to participate in mediation, mediation which was prematurely initiated by Laufers. Laufers advised Plaintiff Rapp to individually negotiate a settlement with

her father, James Berg, and his attorney during mediation, which distracted her from her responsibilities to the Berg Estate and caused her to focus her attention on negotiating a settlement between Weller, Garves, and James Berg. Laufers then advised Plaintiff Rapp to enter the Settlement Agreement which was impossible to fulfill from the moment it was signed and bound Plaintiff to obligations which were not pre-existing. The Settlement Agreement placed Plaintiff Rapp in the untenable position of having to comply with resultant orders which were impossible to execute, first because Plaintiff Rapp, then-personal representative, had a conflict of interest which the parties present at mediation, including Laufers, took advantage of during mediation, and the other, because there was an insufficient amount of money in the Berg Estate to satisfy all the remaining creditors, including the IRS, which is a priority creditor, at the same time not a party to the Settlement Agreement. The Defendants failed to reasonably prepare Plaintiff Rapp for mediation, failed to reasonably and fairly represent Plaintiff Rapp at mediation, failed to ensure that the Berg Estate's assets, receipts, and liabilities were reasonably accounted for prior to mediation, or alternatively, failed to seek postponement of court-ordered mediation when it was reasonably determined that the Berg Estate's accounting and reconciliation with the co-mingled estate, the Estate of Vicki Garves-Berg (hereinafter "Garves-Berg Estate"), was complete. Laufers, Brown Holmen, and Dudley failed to inform Plaintiff Rapp that she should expect to commit to paying out every dollar yet to be received by - and every dollar remaining in - the Berg Estate during mediation, including those which remained unaccounted for during the first ten months prior to her assuming personal representative responsibilities and those which had yet to be

liquidated by opposing parties representing the Garves-Berg Estate.

Further, Laufers, Brown Holmen, and Dudley advised Plaintiff Rapp to separately enter another settlement agreement, this one with AXA, the aircraft insurance company, (hereinafter "AXA Settlement Agreement") which, once signed on January 9, 2012, during mediation, paved the way for one of the wrongful death claimants – Mary Weller (hereinafter "Weller") - to receive not only a full payout of the insurance policy limits but also continue to pursue her claims above that limit against the Berg Estate. In return, the insurer was released from its contractual obligation to defend the Berg Estate from any litigation or any other action related to the plane crash.

When Plaintiff Rapp raised issues she suspected made the Settlement Agreement unworkable for the Berg Estate, starting with the bill she opened which was presented her moments after signing the Settlement Agreement, Rapp promptly raised her concerns with Laufers. Without obtaining Rapp's permission, Laufers conveyed in an email a portion of Rapp's concerns to Stephan Rogge, one of the two opposing counsel who was a party to the Settlement Agreement. This represents ex-parte communication with opposing counsel. Laufers then refused to include some of Plaintiff Rapp's concerns with the then-proposed Settlement Agreement in a letter she requested he write to the St. Croix County Court. Laufers' errors post mediation gave Plaintiff Rapp no option but to terminate Dudley's contract for legal services and forced her to go pro se in order to convey her concerns to the judge. She later hired a new attorney once Laufer's resignation was approved by the court.

Pursuant to the forgoing actions and inactions, Defendants Laufers, Brown

Holmen, and Dudley breached the applicable standard of care, breached the contract, were negligent, misrepresented the Plaintiffs, and negligently misrepresented the Plaintiffs in the legal representation of the Plaintiffs, Laura Rapp individually and Laura Rapp, then-personal representative of the Berg Estate. Defendant Dudley also failed to reasonably and properly supervise Defendants Laufers and Brown Holmen, and as a result of the foregoing, Plaintiff Rapp is irreparably harmed both financially and emotionally during a five year period which should have been the prime of her life.

### C.  JURISDICTION, AND VENUE

1.      Plaintiffs bring their complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.      Jurisdiction and venue are appropriate in this forum because the Plaintiffs live in California, while the Defendants live and conduct business in Minnesota; whereas many of the events complained of in this Complaint occurred in Dunn and St. Croix Counties, Wisconsin.

### D.  FACTUAL BACKGROUND

3.      At all times material, Defendant Laufers was under the direct supervision, authority, employ and control of Defendant Dudley. Laufers is a Minnesota attorney who has since left Dudley's employment and now works for at an office located at 7701 Frances Avenue South, Suite 375, Edina, Minnesota 55435.

4.      At all times material, Defendant Brown Holmen was under the direct supervision, authority, employ and control of Defendant Dudley. Defendant Brown

Holmen is a Minnesota attorney with her office located at 101 East 5th Street, Suite 2602, St. Paul, MN 55101.

5.      At all times material, Defendant Dudley continues to be a law firm operating in the State of Minnesota.  Dudley is managed by Attorney Joseph J. Dudley Jr. and is located at 101 East 5th Street, Suite 2602, St. Paul, MN 55101.

6.      Laurence A. Berg and Vicki Garves-Berg, husband and wife, died together on January 30, 2009 in a plane crash along with a friend, Brett Weller.

7.      Laurence Berg is presumed to have been the pilot of the plane, based upon an NTSB report, though this was never proven in court.

8.      Laurence Berg was the brother of Plaintiff Rapp.

9.      James A. Berg, was the father of Laurence Berg and Laura Rapp.

10.     James Berg was initially appointed personal representative to the Estate.

11.     James Berg hired Cummins Law Office, P.A., to represent him as personal representative of the Berg Estate.  Attorney Dwight Cummins represented the Berg Estate through at least September 14, 2009.

12.     No tort actions were commenced based on the deaths of Vicki Garves-Berg or Brett Weller, but three claims were filed against the Berg Estate based on tort theories:

    a.  On June 22, 2009, Brett Weller's wife, Mary Weller (hereinafter "Weller"), filed a written statement of claim asserting that Laurence Berg negligently operated the airplane, resulting in Brett Weller's death. Weller sought compensation for pecuniary loss, loss of society and companionship, and funeral expenses. Her claim indicated the

amount was "undetermined."

    b. On July 2, 2009, Kenneth Garves, Vicki Garves-Berg's father, on behalf of himself and the Garves-Berg Estate, filed two claims against the Berg Estate for an unspecified amount for "wrongful death, loss of society and companionship, loss of benefits and contributions." The amount of the claim was similarly designated as "undetermined."

13.     Attorney Cummins neglected to file an objection to any of the aforementioned claims within 60 days.

14.     Due to developing health-related problems, James Berg resigned as personal representative and on November, 10, 2009, his resignation was accepted by the St. Croix County Court, and on the same date the Court appointed Laura Rapp, as successor personal representative. The Court set Laura Rapp's bond as out-of-state personal representative at $150,000.

15.     On November 16, 2009, Empire Fire & Marine Insurance Company, as surety, and Laura Rapp provided a bond in the amount of $150,000 to the Judge of St. Croix County Circuit Court, Edward F. Vlack, III.

16.     The bond provides: "The condition of this obligation is such that if the principal shall faithfully perform the duties as: personal representative [under Wis. Stat. § 856.25] . . . then this obligation shall be void; otherwise it shall remain in full force and effect."

17.     The bond further provides:

        The principal(s) will at all times indemnify and save the Surety harmless from and against every claim, demand, liability, cost, charge, counsel fee, expense, suit, order, judgment or adjudication whatsoever in consequence of any bond, undertaking or recognizance executed or

procured by the Surety as mentioned herein, and in the even [sic] of payment by the Surety the principal(s) agree(s) to accept the voucher or other evidence of such payment as prima facie evidence of the propriety thereof and of the principal's liability therefore to the Surety.

18.     In November, 2009, Rapp hired Attorney Joseph Earley (hereinafter "Earley") to represent her in her capacity of personal representative to the Berg Estate.

19.     On April 9, 2010, Weller filed a petition with the court, pursuant to Wis. Stat. § 859.40, to order that the non-testamentary proceeds of Laurence Berg's life insurance proceeds and retirement account be made available to the Berg Estate for the payment of his debts.   Since Laurence Berg and Vicki Garves-Berg died simultaneously, Laurence Berg's father, James Berg (hereinafter "Berg") had become the benefactor of Laurence Berg's life insurance and 401(k) proceeds totaling $235,690.32 after the payment of taxes proceeds.   [These proceeds would ordinarily be exempt under Wis. Stat. § 815.18.]

20.     Excluding the non-testamentary proceeds which Weller sought to bring into the Estate, the net value of the Laurence Berg was estimated to be $415,088.20, according to an inventory Rapp filed with the Court on January 20, 2010.

21.     The relevant statutes providing for bringing non-testamentary proceeds into the estate provides as follows:

> 705.10 Nonprobate transfers on death. (1) A provision for a nonprobate transfer on death in an insurance policy, contract of employment, bond, mortgage, promissory note, certificated or uncertificated security, account agreement, custodial agreement, deposit agreement, compensation' plan, pension plan, individual retirement plan, employee benefit plan, trust, conveyance, deed of gift, marital property agreement, or other Written instrument of a similar nature is nontestamentary. . ..(2) This section does not limit rights of creditors under other laws of this state.

> 859.40 Creditor's action for property not inventoried. Whenever there

is reason to believe that the estate of a decedent as set forth in the inventory may be insufficient to pay the decedent's debts, a creditor whose claim has been allowed may, on behalf of all, bring an action to reach and subject to sale any property not included in the inventory, which is liable for the payment of debts. The creditor's action shall not be brought to trial until the insufficiency of the estate in the hands of the personal representative is ascertained; if found likely that the assets may be insufficient, the action shall be brought to trial. If the action is tried, any property which ought to be subjected to the payment of the debts of the decedent shall be sold in the action and the net proceeds used to pay such debts and to reimburse the creditor for the reasonable expenses and attorney fees incurred by the creditor in the action as approved by the court.

22.     A change in attorneys was then prompted by Earley when he indicated to Rapp that he hadn't anticipated the filing of lawsuits and his firm did not have the infrastructure to defend wrongful death claims. He offered to continue to assist with estate matters, but recommended Plaintiff Rapp hire a litigation attorney to represent her in defense of the wrongful death claims, as he was the only attorney on staff at Earley Law Firm, based in New Richmond, Wisconsin.

23.     On April 30, 2010, Rapp consulted her employer-provided referral firm, Lifeworks, to search of a litigation attorney. Lifeworks referred her to Brown-Holmen, a litigation attorney under the employ of Dudley.

24.     On May 4, 2010, Rapp met, telephonically, with Brown-Holmen, who had invited Laufers to participate in the meeting. During that call, Brown-Holmen indicated that Dudley expected all legal matters involving Plaintiff Rapp and the Berg Estate be handled exclusively by its firm, so Rapp had no choice but to work with Laufers if she wanted to receive counsel from Brown-Holmen pursuant to the wrongful death claims. During this call, Laufers was purported to be a competent and experienced estate attorney.

25.     Rapp conveyed this information to Earley, who on May 28, 2010, filed a Consent to Substitution of Attorneys.

### ***Plaintiff Rapp Hires Defendants Laufers, Brown Holmen, and Dudley***

26.     On May 9, 2010, Plaintiff Rapp paid $2,500 on behalf of herself and the Berg Estate to retain Brown Holmen and Laufers at Dudley in St. Paul, Minnesota.  The retainer check Rapp paid to Dudley cleared the Berg Estate bank account at the First State Bank & Trust in Bayport, Minnesota on May 14, 2010.

27.     Until this case, Plaintiff Rapp had no prior experience with estates or litigation and was reliant upon Laufers, Brown Holmen, and Dudley as legal advisors.

28.     At this point, the two estates, the Berg Estate and Garves-Berg Estate, had not yet liquidated all of the marital assets, nor had the two estates reconciled all its receipts and expenses which had been received and incurred on each estate's behalf. Plaintiff Rapp's expectation based upon numerous statements and representations made by and between attorneys representing both the Berg and the Garves-Berg Estate, including Laufers, as well as the CPA for the Berg Estate was that the two estates would need to reconcile receipts and expenses before being able to close either estate.

29.     On April 30, 2010, Earley filed a response to Weller's April 9, 2010, Petition, denying the claim of unspecified amount and denying that Wis. Stats 859.40 and 705.10 apply in this case.  In this response, Earley objected to Weller's June 22, 2009, claim of unspecified amount and objected to Garves' July 2, 2009, Claim of unspecified amount, indicating that both claims were therefore incomplete and/or contingent , and still subject to challenge.

30.     By May, 2010, Laufers, Brown Holmen, and Dudley were now representing the
Plaintiffs.  Dudley filed a response to the petition indicating that because Weller failed
to specify any amount, her claim was "incomplete and or contingent and is still
subject to challenge."

31.     When Dudley filed its objection, the basis for the objection was that the claim
did not specify an amount.

32.     Dudley did not object to or dispute the claim's assertion that Brett Weller's
death was caused by negligence on the part of Laurence Berg.  Dudley's objection to
Weller's petition, filed at the same time, also did not contest that Brett Weller's death
was caused by negligence on the part of Laurence Berg.

33.     On June 14, 2010, Garves and the Garves-Berg Estate filed amended claims
against the Berg Estate specifying a claim amount of $500,000.

34.     On July 14, 2010, Weller filed a Memorandum of Law in support of her petition
seeking a court determination that Berg's assets from his employment were subject
to the claims of his creditors.  The petition further asserted that Weller's claim had
not been contested and was therefore deemed allowed.

35.     On July 9, 2010, Weller filed an amended claim against the Berg Estate
specifying a claim of $2,000,000.

36.     On August 10, 2010, using a Minnesota probate form, Laufers, Brown Holmen,
and Dudley filed with the St. Croix County Probate Registrar a notice of disallowance
of Weller and Garves' claims, using a Minnesota probate form called a "disallowance
of claim", but did not file any notice of disallowance of claims by the Garves-Berg
Estate.  Furthermore, Dudley attempted to apply Minnesota law regarding the period

for timely response, rather than Wis. Stat. § 859.33.

37.     Because their claims had not been timely objected-to, Weller, Garves, and the Garves-Berg Estate petitioned the St. Croix County Circuit Court to bring non-testamentary proceeds into the Berg Estate because the Berg Estate's assets were insufficient to cover its liabilities.

38.     The assets Weller, Garves, and the WDOR sought to pull back into the Berg Estate included life insurance, accidental death and dismemberment policies (which were not paid out, as previously indicated), and the 401(k).

39.     The Court held on January 7, 2011 that it was likely that the Berg Estate would not have enough assets to satisfy all claims and ordered James Berg to pay the money Wis. Stat. § 859.13 reads in relevant part as follows:

> [n]o claim shall be allowed unless it is in writing, describes the nature and amount thereof, if ascertainable, and is sworn to by the claimant or someone for the claimant that the amount is justly due, or if not yet due, when it will or may become due, that no payments have been made thereon which are not credited, and that there are no offsets to - the knowledge of the affiant, except as therein stated.

40.     Wis. Stat. § 859.33 sets forth the procedure to contest a claim and requires that objections be "served upon or mailed to the claimant and filed with the court within 60 days after the copy of the claim was mailed to or served upon the personal representative or the attorney for the estate."

41.     Also on January 7, 2011, the circuit court judge, Judge Vlack, issued an Order holding that the Berg Estate had "allowed for purposes of [Wis. Stat.] § 859.40" all three claims by failing to object within sixty days. See Wis. Stat. § 859.13. The Court further determined the Berg Estate would be unable to pay all of its debts if it were ultimately found liable for the alleged torts.

42.     As the Court further stated in its Order:

> Whether or not Wis. Stat. § 859.40 allows Mary Weller and the Vicki L.
> Garves-Berg Estate to reach the non-testamentary property turns
> largely on whether the wrongful death claims are considered Berg's
> debt. Mary Weller's claim, for $2,000,000.00 and the claims of Garves
> and the Vicki L. Garves-Berg Estate for $500,000.00 would make the
> Estate of Berg's inventory short of covering its debts. Should Laurence
> Berg ultimately be found legally liable for the crash and unfortunate
> deaths of himself, his wife and Brett Weller, it is certain that his estate
> will be insufficient to pay its debts under § 859.40.

43.     The Court concluded:

> At this stage of the proceedings, Mary Weller, Kenneth Garves and the
> Vicki L. Garves-Berg Estate have persuaded the Court that their claims
> complied with Wis. Stat. § 859.13 and were allowed as the Estate of
> Laurence Berg failed to file timely objections as required by Wis. Stat. §
> 859.33. Furthermore, the Court also agrees that the claimants are
> creditors when the broad sense of that Word is read into § 859.13,
> Based upon the assets of the Estate of Laurence Berg and potential
> liabilities, it is also likely that the estate will 'lack sufficient assets to
> cover its debts.
>
> The claimants established the requisite elements of a viable claim under
> § 859.40 and, for the reasons set forth herein, IT IS HEREBY ORDERED
> THAT the petition of the claimants is granted and James Berg is
> ordered to pay the amounts he received in life insurance proceeds and
> 401(k) proceeds into the Court.

44.     Berg was ordered to pay into the court the non-testamentary life insurance

and 401(k) proceeds he received following his son's death.

45.     After placing those funds in a Wells Fargo Bank account until the control of the

St. Croix County Court, James Berg appealed the court's January 7, 2011, Decision.

46.     Nevertheless, as a direct and proximate result of the negligence of Laufers,

Brown Holmen, and Dudley, the Berg Estate conceded liability on the claims of Weller,

Garves, and the Garves-Berg Estate.

47.     Because the Court concluded that the claims were deemed allowed, the only

issue for resolution was the amount of damages.

48.     On May 13, 2011, the IRS filed a Final Notice and Intent to Levy on the Laurence A. Berg Estate the amount of $195,221.62 for 2006 to 2008 for federal income taxes owed. This Notice was sent to Laufers via email by the Vicki Garves-Berg Estate on May 18, 2011.

49.     On May 16, 2011, the IRS filed a Notice of Federal Tax Lien on the Laurence A. Berg Estate in the amount of $67,948.33 for 2006 and 2007 federal income taxes owed. This Notice was sent to Laufers via mail by the Vicki Garves-Berg Estate on June 1, 2011.

50.     On July 7, 2011, Krzoska filed an affidavit reiterating the need to reconcile accounts between the Garves-Berg Estate and Berg Estate.

51.     On July 11, 2011, Laufers advised Plaintiff Rapp that the accounting reconciliation was necessary to "make sure as much money is preserved as possible for all creditors (because as a formally administered estate, we require the) Judge's approval to pay all claims."

52.     On August 3, 2011, Gille emailed Plaintiff Rapp, referring to the lack of response from (Laufers) regarding documents in the file which she needed to complete the accounting.

53.     In an August 3, 2011 email to Defendant, Plaintiff Rapp summarized the joint income tax liabilities of the Berg Estate and the Garves-Berg Estate, as well as the fiduciary tax liability of the Berg Estate. Rapp expressly noted that penalties and interest were excluded from her summary because she did not know what those figures were since the IRS notices are being sent to the Garves-Berg Estate's mailing

address in LaCrosse, Wisconsin. Defendant Laufers acknowledged this information in his email response dated August 3, 2011.

54. On October 11, 2011, the IRS filed a Notice of Federal Tax Lien Filing against the Berg Estate in the amount of $44,741.90 for 2009 Fiduciary Tax Due, pursuant to a 1041 Tax Filing. Including interest and late penalties, the total fiduciary tax due was $50,545.87.

55. On November 1, 2011, Plaintiff Rapp forwarded the aforementioned document to Laufers via email, pointing out that a hearing must be requested with the IRS by November 18, 2011.

56. On December 5, 2011, while the appeal in *In re Berg I* was pending, the court ordered "all parties, claimants, creditors, or anyone who may claim an interest in, or against, (the Berg Estate), participate in mediation.

57. On December 12, 2011, Dudley emailed Plaintiff Rapp a letter directed to Laufers from the IRS; it provided the IRS' position when distributions are made from an estate: "in making any distribution from the estate, we draw your attention to 31 U.S.C. Section 3713(a) and (b), which provide for the payment of priority Federal claims when the decedent dies insolvent. This section provides that a claim of the United States government shall be paid first when the estate of a deceased debtor is insufficient to pay all debts of the debtor. **The priority of the United States cannot be impaired or superseded by State Law** (emphasis added). Any executor, administrator or other person who fails to comply with these priority provisions, may become personally liable for said debt." This letter goes on to list the following five judicial exceptions to the absolute priority: reasonable costs of administrative

expenses; prior perfected real estate mortgages; judgements perfected prior to the filing of notice of federal tax lien; funeral expenses; and reasonable widow's/family allowance, if permitted under appropriate State law.

58.     On December 12, 2011, Dudley provided Plaintiff Rapp a copy of a letter being mailed the same day to CPA Gille, which referred to correspondence and documents Dudley received from the barrister settling the Canadian property sale and ING statements.  Plaintiff Rapp's referenced copy of the letter did not include enclosures.

59.     On December 12, 2011, Laufers emailed Plaintiff Rapp regarding his receipt of "something from the IRS regarding IRS policy on past due tax debt in estates" and goes on to state "It favorably clarifies the issue of personal liability that you were concerned about."

60.     On December 14, 2011, Dudley provided Plaintiff Rapp a copy of a reminder letter sent to Laufers dated December 12, 2011.  It reminded Laufers and opposing counsel that "submissions (are) due by January 3.  Please take a moment to make sure you will be in a position to go forward with the mediation on that date."

61.     On December 15, 2011, Laufers emailed Plaintiff Rapp, stating "I had a conversation with the General Counsel of the IRS for Wisconsin.  Nothing bad at all. I would like to talk with you about what occurred."

62.     On December 16, 2011, Plaintiff Rapp requested via email an appointment to discuss the proposed letter to mediator, the proposed settlement on plane insurance policy, and Laufers' discussion with the IRS.

63.     On December 19, 2011, CPA Gille emailed Plaintiff Rapp, indicating that she had "received a package from [Laufers] late last week.  He provided the ING

statement…and a copy of the Canada closing statement. It was a crazy week, and I haven't had a chance to review any of it yet, or I would have let you know."

64.     On December 20, 2011, Plaintiff Rapp received via email a formal letter from Laufers indicating that "We need to send out a list of expenses paid by the estate soon. It was my understanding that Cathy was going to be working on that project. Can you get that to me by Tuesday, December 27, 2011(?)"

65.     On December 27, 2011, Krzoska emails the following request to Laufers "In preparing for the upcoming mediation, we would like to exchange financial information so that both sides know what cash is available for settlement of the IRS/Wisconsin Department of Revenue claims and therefore if there is anything available for the other claimants. We should also reconcile whether the Estates owe each other money based on joint expenses that were paid by one or the other. Do you have that information ready to exchange?"

66.     On December 27, 2011, Laufers responded to Krzoska "I am working on that information. I will have it to you by no later than January 3."

67.     On December 27, 2011, Laufers forwards the above email exchange to Plaintiff Rapp stating "I would like to have this information compiled by January 3. I will need Cathy (CPA Gille) to help do this."

68.     On December 28, 2011, Rapp forwarded an attachment titled "LAWRENCE BERG ESTATE", asking Laufers "Do you mean you need something more than what (CPA Gille) provided us on December 9th (please see the attached). As you can see from (CPA Gille's) transmitting email, she cannot do a reconciliation of the balance sheet without access to additional information. From looking through my files, I am

unable to provide much of any of the reconciling information, as the information provided in the files I inherited (from former personal representative James Berg) contain insufficient detail. Perhaps if you provided both (CPA Gille and me) the work that Shelly Brown from your office did, that would help (CPA Gille) get started."

[Note: the December 9, 2011, Attachment contained a list of some questions/issues that CPA Gille indicated she had, including some prior requests, and asked Laufers to advise if she had posted any transactions to the wrong account. The attachment also reflected $178,337.97 in the Berg Estate bank account, $0 due from the Garves-Berg Estate account, and no mention of any amount due to the Berg Estate pursuant to the Canadian property sale.]

69.     On December 28, 2011, Plaintiff Rapp emailed Laufers a series of questions and comments in preparation for the meeting they requested in reference to the preceding item. Among their questions was whether the upcoming mediation was a joint one with the Garves-Berg Estate, and if so, Plaintiff Rapp stated her desire to ensure during mediation that the Berg Estate not agree to paying any more than one-half of the back-taxes, penalties, and interest owed to the IRS and the State of Wisconsin pursuant to Vicki Garves-Berg's business income which she neglected to properly report in 2006, 2007, and 2008, and for income earned in 2009. Plaintiff Rapp reminded Laufers in this email correspondence that Laurence Berg was flying that plane on January 30th for Vicki's business reasons: to bring her back home from her out-of-town business venture. Had the plane not crashed, Plaintiff Rapp reminded Laufers, Vicki Garves-Berg would have written off the associated trip expenses against her business income. Plaintiff Rapp added that Laurence Berg paid

the ultimate cost for Vicki Garves-Berg's business; therefore, his estate should also not have to pay any more than its share of Vicki Garves-Berg's lingering debts.

Plaintiff Rapp also asked about creditors who were not notified about the upcoming mediation, including the creditor who owned the Berg Estate home loan. Plaintiff Rapp asked if the aforementioned creditor foreclosed and forgave the debt, because she was unclear in that regard, and indicated she still had the questions she detailed in her October 19, 2011, email to Laufers. Lastly, Plaintiff Rapp said "Since estate administration expenses are paid first, even before IRS debt, and I noticed the IRS reinforced the importance of them being reasonable in its latest letter, I was wondering if it's important to clearly document and agree to the estate administration expenses, including attorney and (personal representative) fees, during this mediation? I have read that (personal representative) fees ranging from 3-5% are reasonable and customary; given the protracted nature of this estate and all the time and effort we've all devoted to its resolution, I propose the estate pays me a (personal representative) fee of 5%."

70.     Following a December 28, 2011, teleconference with Defendant Laufers, Plaintiff Rapp provided Laufers a summary of the parties interested in the mediation in a December 28, 2011, pursuant to his request. In this email, Plaintiff Rapp reminded Laufers about the real estate located at 713 Rose Street in LaCrosse, Wisconsin which was held in Vicki Garves-Berg's name and her brother, Daniel Garves' name, until her passing. [In accordance with Wis. Stat. § 859.40, this real estate may available to pay the joint tax obligations of the Berg Estate and the Garves-Berg Estate, particularly the portion that arose as a result of Vicki Garves-Berg's

failure to report on her tax returns income she earned from her Vital Anesthesia Services, Ltd. business.]

71.     In this same email, Plaintiff Rapp reminded Laufers that opposing counsel Stephan Rogge - who continued to represent Garves throughout these proceedings until he passed away - told co-counsel Krzoska, who conveyed to Berg-Estate counsel that he considered himself as Laurence Berg's best friend, and that he was married to Vicki Garves-Berg's best friend.  In Plaintiff Rapp's mind, Attorney Rogge should have recused himself from this case, and/or he Berg Estate should have made an issue of it, but neither of those things occurred.

72.     In his letter to the mediator, Laufers conveyed some, but not all of Plaintiff's Rapp's requests of the mediator.  Upon reflection, none of Plaintiff Rapp's requests were incorporated into the Settlement Agreement.

73.     On December 28, 2011, Laufers formally requested from CPA Gille via email a statement by Monday morning (January 2, 2012) of the following: current assets including all cash in hand and values of all non-cash assets and current liabilities. Specifically, Laufers wanted an indication of what amount "we have on hand" to settle estate liabilities.  He also wanted a separate schedule indicating all expenses of administration, including attorneys' fees, accountant fees, and expenses paid on other assets owned by the estate.  He enclosed an inventory of the Berg Estate as of the date of Laurence Berg's death, January 30, 2009.

74.     CPA Gille responded to Laufers' last minute, ill-timed request as follows: "…Since it is Wednesday afternoon, and I have appointments filling the rest of today, the earliest I will be able to look at this file is tomorrow.  I have several appointments

scheduled for tomorrow, since this is the end of year tax planning time. Our office closes at Noon on Friday and will not reopen until Tuesday, due to the New Years holiday. Unfortunately, I have been trying to work on this file for many, many months and have had little assistance from the legal side (Dudley) in those efforts. The timing of the recent request is very unfortunate, as I have made promises and have several deadlines pending. I am not willing to break those promises and shortchange my clients in their year-end planning work in order to meet this short deadline on a project that should have been completed long ago. I have provided your office with a complete general ledger which lists every transaction I have been made aware of. Please use this information to compile the information you currently need, and I will attempt to find some time tomorrow or Friday to again open the file."

75.     Recognizing the challenged presented by Laufers' delinquent request, Plaintiff Rapp, who is not an accountant, assembled a statement of financial position based upon her best guess of the Berg Estate's assets at the time. There were several items that were clearly noted as estimated or identified as incomplete on this one-page form.

76.     Laufers responded to Plaintiff Rapp's aforementioned email with "that is exactly what I needed".

77.     CPA Gille subsequently checked in with Laufers and asked him if there was anything else he needed (in preparation for mediation) and Laufers responded again that he had everything he needed.

78.     Shortly before mediation, Laufers sent a letter to the mediator, along with the non-accountant prepared Statement of Financial Position prepared by Laura Rapp,

representing to all that it was CPA-prepared.  Laufers failed to acknowledge in the letter the deficiencies in the provided information.

### _Laufers, Brown Holmen, and Dudley Failed to Ensure a Reasonably Complete and Accurate Accounting of the Remaining Assets of the Berg Estate in Advance of Court-Ordered Mediation or, alternatively, Laufers, Brown Holmen, and Dudley Failed to Request a Delay in Mediation_

79.     Examples thereof of the Statement of Financial Position's deficiencies, besides the estimates and deficiencies expressly identified, were that it excluded assets or the liquidation-thereof that had been in the possession of Garves and opposing counsel for the co-mingled Garves-Berg Estate, one-half of the proceeds of which should have been paid to the Berg Estate.  These assets were identified for the court through Plaintiff Rapp's interim accounting dated October 31, 2012.  The tally for these items was an estimated $121,000 which remained, and as far as Rapp knows remains, due from the Garves-Berg Estate.  Besides Garves-Berg's share of the joint federal income taxes paid on its behalf, this includes the Berg Estate's share of marital assets sold or otherwise liquidated, including a Mercedes, a mink coat, an insurance payout for lost or damaged gold, diamond, and silver jewelry, and proceeds from the sale of the household furnishings following auction, and proceeds from the sale of Vicki Garves-Berg's business, as well as proceeds from intellectual property rights which may have been sold or gone unrecognized by the Garves-Berg Estate.

80.     On more than forty occasions between 2010 and early 2012, counsel including Earley, Krzoska – counsel to the Garves-Berg Estate, and even Laufers

himself would formally refer to the need to reconcile the accounting of the Berg Estate and the Garves-Berg Estate. CPA Gille would oftentimes do the same.

81. Further, in spite of Laufers knowledge of the CPA Gille's work on the Berg Estate accounting, Laufers and Dudley required the Berg Estate to also pay for the Dudley accounting or bookkeeping services of Shelly Brown to enter the accounting information in a form Dudley required; however the results or benefit thereof was never made provided to CPA Gille or Plaintiff Rapp.

### *Laufers, Brown Holmen, and Dudley Failed to Ensure the Assets of the Berg Estate were Liquidated, all Expenses Were Fully Identified, and All Shared Receipts and Expenses with the Co-mingled Garves-Berg Estate Were Reconciled in Advance of the Court-Ordered Mediation*

### *and*

### *Laufers and Brown Holmen Failed to Reasonably Prepare Plaintiff Rapp for Mediation*

82. Several days before mediation, Plaintiff Rapp requested the opportunity to meet with Laufers the day prior to mediation in order to prepare for mediation. Alternatively, she indicated she offered to meet him a few hours before mediation begins.

83. Laufers responded that they can meet 15 minutes before mediation was scheduled to begin.

84. Mediation was held on January 9, 2012.

85. Plaintiff Rapp appeared at the mediation as the personal representative of the Berg Estate, represented by Laufers.

86.     The first part of mediation was devoted to settling a claim Weller made against AXA Insurance, the insurance carrier for Laurence Berg's and Vicki Garves-Berg's airplane which crashed. Laufers advised Plaintiff Rapp to sign a settlement agreement between the Berg Estate, AXA Insurance Company, and Weller. The settlement agreement provided that the insurance carrier pay out the face value of its policy $100,000 + $3,000 medical benefit for funeral expenses to Weller. The agreement fully released AXA from any further claims, including its responsibility to defend the Berg Estate from accident-related litigation. It also allowed Weller to continue to pursue the Berg Estate for further claims against the Berg Estate. The Berg Estate received questionable benefit, and neither the Berg Estate nor its personal representatives were released from further liability arising out of accident-related claims.

87.     James Berg did not attend mediation; however, the initially proposed settlement agreement that Laufers advised Plaintiff Rapp to sign called for James Berg to pay $120,000 to the Berg Estate. When asked how she can sign something which she didn't know whether her elderly father was willing to contribute, Laufers advised Plaintiff Rapp to contact James Berg to see if he would be willing to pay the $120,000 towards settling the claims made against him by Weller and Garves. Laufers' advice to Plaintiff Rapp represented a conflict of interest to Rapp and Laufers should have never put his client in this position. This situation distracted her from the outset of mediation from her interest in settling the affairs of the Berg Estate and instead put her in a position where she was negotiating with her elderly father and his attorney, rather than concentration on settling the Berg Estate.

Plaintiff Rapp's father's health had been deteriorating following the sudden and unexpected passing of his only son, Laurence Berg, combined with the near relentless pursuit he was experiencing from Garves and Wellers' attorneys.

88.     The parties at mediation and James Berg reached a settlement agreement (of sorts) on January 10, 2012, the day following mediation.

### *Laufers Advises Rapp to Sign the Settlement Agreement Which Did Not Resolve All Financial Matters Pertaining the Berg Estate and Committed Rapp to a Substantial Obligation the Berg Estate Could Not Pay*

89.     Laufers encouraged her to settle pursuant to an "agreement" that James Berg would pay $120,000 to the Estate, with $80,000 going to Weller and $40,000 to Garves.  In exchange, Weller and Garves agreed to a "complete release of all claims, past, present, and future[,]" which effectively required two separate parties to perform before either party could receive a release.

90.     The Settlement Agreement directs the Berg Estate to pay $200,000 to the taxing authorities, though it does not specify what amount would be paid to which authorities and for what type of taxes.

91.     WDOR agreed to accept $64,719 as payment in full "subject to final review and approval by the Department," although, again, there was no agreement as to which estate or estates would pay this amount or when.

### *Laufers Advised Plaintiff Rapp to Write Payout Substantially All of the Funds in the Berg Estate Bank Account, Before the Settlement Agreement Was Approved by the Court Overseeing this Formally-administered Estate.*

92.     On January 10, 2012, the day after mediation, Laufers advised Rapp to pay all

more money than there was in the Berg Estate account to the IRS and to the WDOR. Rapp followed Laufers' advice and directed a check to the IRS, but expressed concern that the payment Laufers instructed Rapp to make would cause her to overdraw the Berg Estate account. Furthermore, she questioned Laufers' advice to pay an agreed upon amount pursuant to an agreement that was not yet approved by the court for this formally administrated Berg Estate (which was not approved until seven months later).

93.     Further, Rapp had been advised during mediation that payments to taxing authorities come after the costs of burial and the costs of administration, but Rapp had not yet received her fees for serving as personal representative, nor had the Berg Estate been fully settled, so additional estate administration costs could arise, as they did immediately after mediation when, for example, an unanticipated bill from the mediator was presented.

94.     Further, payment of all of the Berg Estate funds would not resolve the claims of the wrongful death claimants and would leave no money to pay any additional tax liability to the IRS, since the IRS was not a party to the Settlement Agreement.

95.     At Laufer's instruction the day after mediation, before Rapp had the opportunity to review the Settlement Agreement, Plaintiff Rapp paid the IRS $161,567.24 from the Berg Estate bank account.

96.     In the same email, Laufers also instructed Plaintiff Rapp to pay the WDOR $38, 432.76, as well; however, Plaintiff Rapp had to in turn remind Laufers that doing so would cause the Berg Estate to overdraw its account, evidencing the fact that Laufers did not have a grasp of the financial position of the Berg Estate, either then, or at the

January 9, 2012, mediation.

97.    The payment to the IRS largely depleted the assets of the Berg Estate, and

when combined with the proposed payment to the WDOR, left no funds for

administration, much less compliance with the Settlement Agreement.

98.    Meanwhile, on January 18, 2012, the Wisconsin Court of Appeals reversed

Judge Vlack's January 7, 2011 Order for Berg to pay the life insurance and 401(k)

proceeds he received following Laurence Berg's passing. *In re Estate of Berg*, 2012

WI App 27, 339 Wis2d 491, 809 N.W.2d 901 ("*In re Berg I*") in part, holding that

Laurence's life insurance and 401(k) proceeds, paid to James Berg, were not "liable

for the payment of debts" under Wis. Stat. § 859.40:

> Therefore, none of the nontestamentary proceeds Berg received were
> liable for the payment of the three tort claims that were contingently
> allowed against Laurence's Estate.  Consequently, the circuit court
> erred when, relying on the tort claims, it ordered that the
> nontestamentary proceeds be made available for payment of the
> Estate's debts under Wis. Stat. § 859.40.

### *Laufers Participated in Ex-parte Communication, Then Refused to Raise*

### *Substantive Concerns of Plaintiff Rapp's in a Letter She Requested*

### *He Write to the Judge*

99.    Soon thereafter, Plaintiff Rapp raised with Defendant Laufers issues she

suspected made the Settlement Agreement unworkable for the Berg Estate, starting

with the bill she opened which was presented her moments after signing the

Settlement Agreement.  Without obtaining Rapp's permission, Laufers conveyed in

an email a portion of Rapp's concerns to Stephan Rogge, one of the two opposing

counsel who was a party to the Settlement Agreement.  Laufers then refused to

include some of Plaintiff Rapp's concerns with the then-proposed Settlement

Agreement in a letter she requested he write to the St. Croix County Court. As a result, Plaintiff Rapp had no option but to terminate Dudley's legal services.

100. On January 23, 2012, Garves filed a motion to approve the settlement agreement.

101. Plaintiff Rapp, on behalf of the Berg Estate, objected on the primary contention was that the Berg Estate did not have sufficient assets, at the time of mediation, to fulfill the agreement.

102. Plaintiff Rapp also objected that the agreement lacked specificity, as it: (1) failed to reconcile the co-mingled Berg Estate and Garves-Berg Estate; (2) conflicted with Wis. Stat. § 859.25; and (3) had no deficiency provision.

103. Meanwhile, on March 20, 2012, James Berg died while the motion to approve the Settlement Agreement was pending.

104. In spite of Rapp's objections, Judge Vlack approved the settlement without modification by order on May 11, 2012.

105. Ms. Rapp moved for reconsideration of that decision on May 30, 2012.

106. Because the Settlement Agreement was approved by the Judge after James Berg's passing, the amount Berg committed to pay Weller and Garves via the Berg Estate were now subject to the probate laws of the State of Texas.

107. Whereas, the funds held by the St. Croix County Court in Wells Fargo Bank at the time of James A. Berg's passing were funds which James Berg had originally placed his living trust account with Wells Fargo Bank, years before the January 10, 2012, Settlement Agreement. As such, those funds necessitated return to Berg's trust following the Appellate Court January 18, 2012, Ruling.

108. On June 19, 2012, while her motion for reconsideration was pending, Rapp was appointed executor of the James A. Berg Estate in Travis County, Texas.

109. On August 13, 2012, Judge Vlack entered an order denying Ms. Rapp's motion for reconsideration, challenging the Settlement Agreement.

110. Two weeks later, on August 27, 2012, Garves filed two affidavits and two proposed orders. Garves sought to "docket" the August 13, 2012, Order as the final "judgment."

111. The circuit court signed both proposed orders, without modification, on September 17, 2012. The first order directed that within five days Rapp "shall collect $120,000.00 from the Estate of James Berg, or from James Berg's Living Trust, or from any other asset that James Berg may have ever owned."

112. The second order directed the Laurence Berg Estate to "make payment in the amount of $38,432.76 to the Wisconsin Department of Revenue within five (5) days of this Order."

113. The most critical defect was that the orders created a conflict of interest between Rapp's fiduciary duties as personal representative to the Berg Estate and her fiduciary duties to the James A. Berg Estate. Under Texas law, Rapp could not just "pay" $120,000 from the James A. Berg Estate, particularly to creditors without claims on file with the estate.

114. Moreover, Ms. Rapp had a fiduciary obligation to comply with Texas law, the priority statute that governed payment of all claims. Tex. Estate Code § 355.102.

115. Likewise, the order to pay $38,432.76 to WDOR was impossible to follow because by August 13, 2012, the Berg Estate was practically insolvent.

116.     Furthermore, the IRS asserted additional claims over and above those already paid by Plaintiff Rapp out of the Berg Estate, pursuant to the Settlement Agreement.

117.     Plaintiff Rapp has received zero compensation for her role as personal representative for the Berg Estate. In fact, she has advanced over $150,000 to the Berg Estate to cover legal expenses as a direct result of the negligence of Laufers, Brown Holmen, and Dudley.  See Wis. Stat. § 859.25(1)(a) (costs and expenses of administration shall be paid first), and the associated legal expenses continue to grow.

118.     The foregoing is also a violation of Plaintiff Rapp's civil rights in that she deserves fair and reasonable compensation for her nearly three years' worth of work as personal representative to the Berg Estate, work which unquestionably occurred between November, 2009 and September, 2012, and continued well beyond the date in which the Appellate Court accepted Rapp's September, 2012, resignation finally in 2015.

119.     The order for the Berg Estate to pay WDOR created another problem. If Rapp as personal representative had paid the WDOR before she resolved the IRS claims, she would face personal liability for the payments under federal law. 31 U.S.C. § 3713 (if the United States is not paid first from an estate, the representative of that estate "is liable to the extent of the payment for unpaid claims of the Government").

120.     On September 24, 2012, Rapp filed a letter objecting to the two orders, asserting her attorney was in the process of scheduling a hearing on them.

121.     Rapp contended that the order regarding the DOR was unnecessary and that both orders were inappropriate because they had not been proposed by the parties

ultimately entitled to the funds.

122.    Additionally, Plaintiff Rapp sought to resign as personal representative of Berg Estate and be discharged on her personal representative's bond.

123.    At the October 1, 2012, Hearing, Plaintiff Rapp asserted she could not comply with the order to collect $120,000 from James Berg's estate because the order created a conflict of interest between her role as personal representative of the Berg Estate and her role as executor of the James A. Berg Estate. The court denied Rapp's requests to resign and be discharged on her bond.

124.    On October 8, 2012, Rapp moved for reconsideration of the September 17, 2012, Orders. Following numerous additional filings by various parties, the court heard argument on April 8, 2013.

125.    Ultimately, the court entered a written order on October 7, 2013, denying Rapp's motions to reconsider the September 17, 2012, Orders.

126.    Additionally, the court held there was "no conflict of interest ... that would prevent [Rapp] from complying with the Court's order to collect $120,000.00 in accordance with the Settlement Agreement. ... The conflict, if one exists, was created when she accepted the position as personal representative of the James Berg Estate."

127.    Further, the court indicated it was exercising its discretion to disallow Rapp's resignation as personal representative of Berg Estate.

128.    Rapp appealed the October 7, 2013, Order.

129.    On April 28, 2015, the Wisconsin Court of Appeals reversed the October 7, 2013, Order in part to the extent that Rapp would not be permitted to be removed as personal representative.

130.     The Court affirmed the Circuit Court's holding that Rapp was required to collect $120,000 from James Berg's Estate.

131.     Because the Berg Estate was insolvent at this point, Garves, Weller, and the WDOR moved the St. Croix County Court on or about September 29, 2015, to surcharge the bond held by Empire Fire & Marine Insurance Co.

132.     Empire Cross-claimed against Plaintiff Rapp, individually, for payment of the $150,000 bond amount.

133.     On October 28, 2016, the circuit court granted summary judgment to Weller and the WDOR in the amount of $118,432.76, plus costs of $644.23.

134.     Plaintiff Rapp and Empire appealed.

135.     On October 31, 2017, the Court of Appeals upheld the circuit court's decision.

136.     Plaintiff Rapp and Empire have since petitioned the Wisconsin Supreme Court for a review of this case and are awaiting the Supreme Court's decision.

137.     Empire has exhibited its intentions to collect from Rapp the full cost of the bond, should the Wisconsin Supreme Court not reverse this case.  Even still, Empire is expected to pursue Plaintiff Rapp for its legal costs.

138.     None of the motions, litigation, or appellate activity, which drained the financial resources of Plaintiff Rapp, would have been necessary but-for the negligence of Laufers, Brown Holmen, and Dudley for failing to adequately prepare Plaintiff Rapp for mediation, for failing to inform Plaintiff Rapp that she would be expected to commit to paying out all of the Berg Estate's assets at mediation, and for advising Plaintiff Rapp to enter the January 10, 2012, Settlement Agreement which caused and continue to cause Plaintiff Rapp financial and emotional harm.

139.     None of the legal costs incurred by Plaintiff Rapp, personally, or as the former personal representative to the Berg Estate, including the obligation to pay Empire, the latter of which case is pending before the Wisconsin Supreme Court, would have been incurred but-for the failure by Laufers, Brown Holmen, and Dudley to adequately prepare Rapp for mediation, to reasonably account for the assets of the Berg Estate in advance of mediation, and to reasonably advise Rapp in the settlement of this probate and the wrongful death claims.

140.     Plaintiff Rapp has suffered personally as a result of the failure of Laufers, Brown Holmen, and Dudley to reasonably advise her in the settlement of this case.

141.     Plaintiff Rapp has suffered personally because the settlement of this case did not resolve the IRS' claims against the Berg Estate, and it remains a priority creditor.

142.     Upon the advice of Laufers, Brown Holmen, and Dudley, Plaintiff Rapp signed the January 10, 2012, Settlement Agreement, upon the belief that it would resolve all the financial matters facing the Berg Estate.  Instead, the Settlement Agreement created problems for the Berg Estate and Plaintiff Rapp.  Laufers, Brown Holmen, and Dudley knew or should have known that Laufers engaged in misconduct, negligence, and gross negligence similar to the misconduct alleged herein.

143.     As a direct result of the misconduct, negligence, and gross negligence by Defendants' actions and inactions, Plaintiff Rapp has suffered and continues to suffer financial distress, severe emotional distress, loss of professional reputation, and psychological injuries with attendant physical manifestations that have prevented the Plaintiffs from normal daily activities and obtaining the full enjoyment of life.  Plaintiff Rapp, a federal government employee, was intending to retire when she reached the

age of 56, which is her current age, but now she has to delay retirement another 5-6 years until she can reduce the debt that has been amassed as a result of the resultant legal action that has been taken against her, all a direct result of the fall-out associated with the January 10, 2012, Settlement Agreement which Laufers, Brown Holmen, and Dudley advised her to sign.

144.    Because there is no money left in the Berg Estate to satisfy the wrongful death claims and the tax liability owed to the WDOR (let alone the IRS or the remaining costs of administration), Weller and the WDOR have received summary judgement against Empire, via Rapp's personal representative bond and Empire, as a result, is seeking to collect on the bond from Rapp.

145.    Plaintiff Rapp is facing bankruptcy as a result.

146.    In addition to the foregoing, Plaintiff Rapp, as former personal representative has been charged with contempt of court for failing to comply with the orders that arose pursuant to the Settlement Agreement and that action remains pending.

## SUMMARY

In conclusion, by proceeding with the January 9, 2012, Mediation with incomplete and estimated financial information and not ensuring all federal taxes including fiduciary taxes, penalties, and interest were factored into negotiations during mediation, Laufers was grossly negligent in his representation of Plaintiff Rapp.  He grossly erred in advising Plaintiff Rapp to enter into the January 10, 2012, Settlement Agreement and caused Plaintiff Rapp irreparable harm.  As an attorney hired to handle the affairs of an estate and reported to be experienced therein, Laufers had a reasonable responsibility and duty of care to ensure that all claims,

including claims associated with fiduciary taxes which are priority claims against an estate, are paid upon the settlement of an estate in order to protect his client, the then-personal representative, from associated liability. The IRS filed its claim against the Berg Estate for fiduciary taxes on October 11, 2011 and Laufers received a copy thereof on November 1, 2011, so he cannot deny knowledge thereof.

The January 10, 2012, Settlement Agreement the Defendants advised Plaintiff Rapp to sign not only did not resolve all of the outstanding financial issues related to the Berg Estate, as ordered pursuant to mediation, but instead resulted in additional and unresolvable problems for Plaintiff Rapp which did not previously exist. The Settlement Agreement resulted in a deficiency in the payment to creditors or claimants which placed Plaintiff Rapp in a position in an untenable position in which she could not fulfill its terms.

The Settlement Agreement neglects to provide for payment of all of the Federal taxes due from the Berg Estate; it neglects to provide for a reconciliation of all receipts due from and expenses paid on behalf of the Garves-Berg Estate; it operates as an unintended and inappropriate waiver of the Personal Representative's fees; and it actually precludes settlement of the wrongful death claims against the Berg Estate and the associated release thereof, and lastly, it provided the foundation for the wrongful death claimants case against Plaintiff Rapp's bond.

Like in *Helmbrect v. St. Paul Insurance Co.,* 122 Wis. 2d 94, 362 N.W. 2d 118 (1985), the Settlement Agreement that Laufers, Brown Holmen, and Dudley advised the Plaintiffs to sign is unworkable and was so from the beginning, and the Defendants did not exercise diligence or an ordinary standard of care in their duties

to Plaintiff Rapp in preparing her for mediation and then advising her to sign the Settlement Agreement. As a result, Plaintiff Rapp has experienced severe financial and emotional distress since signing it because of the legal and financial problems it created. Further, had Laufers, Brown Holmen, and Dudley advised Plaintiff Rapp to enter a more carefully crafted set of settlement agreements, conclusion of the Berg Estate could have been efficiently and effectively brought to a close and Plaintiff Rapp would have not had to endure the financial and emotional distress and angst of the past five plus years, culminating with the legal action now pending against Plaintiff Rapp's bond which is still outstanding in connection with the Berg Estate.

Plaintiff requests the court toll the statute of limitations until a jury renders a decision on this case or until the lawsuit is otherwise resolved.

## COUNTS

### COUNT I - Legal Malpractice

147. As a result of Defendants' legal malpractice, Plaintiffs reassert the allegations contained in the Complaint and incorporate them by reference as though fully set forth herein.

### COUNT II – Breach of Standard of Care

148. As a result of Defendants' breach of the standard of care, Plaintiffs reassert the allegations contained in the Complaint and incorporate them by reference as though fully set forth herein.

### COUNT III - Breach of Contract

149. As a result of Defendants' breach of contract, Plaintiffs reassert the allegations contained in the Complaint and incorporate them by reference as though fully set

forth herein.

## Count IV – Negligence

150.    As a result of Defendants' negligence, Plaintiffs reassert the allegations contained in the Complaint and incorporate them by reference as though fully set forth herein.

## Count V – Misrepresentation

151.    As a result of Defendants' misrepresentation, Plaintiffs reassert the allegations contained in the Complaint and incorporate them by reference as though fully set forth herein.

## Count VI – Negligent Misrepresentation

152.    As a result of Defendants' negligent misrepresentation, Plaintiffs reassert the allegations contained in the Complaint and incorporate them by reference as though fully set forth herein.

## Count VII – Negligent Supervision
## (DUDLEY DEFENDANT)

153.    Plaintiffs incorporate all paragraphs of this Compliant as if fully set forth under this Count and further alleges that: At all times material, Laufers and Brown Holmen were employed by Defendant Dudley and/or was under Defendant's direct supervision and control when they committed the wrongful acts herein.  Laufers and Brown Holmen engaged in legal malpractice while acting in the course and scope of their employment with Defendant Dudley and failed to exercise diligence and duty of care and thus accomplished the negligence and gross negligence by virtue of their job-created authority.  Defendant Dudley failed

to exercise ordinary care in supervising Laufers' and Brown Holmen's in their assignment and failed to prevent the foreseeable misconduct of Laufers and Brown Holmen from causing harm to others and property.

154.    As a result of Defendant Dudley's negligent supervision, Plaintiffs reassert the allegations contained in the Complaint and incorporate them by reference as though fully set forth herein.

All of the foregoing acts have been caused by or are associated with the malpractice of the Defendants; each and every one ignoring the best interest and duty owed the client.  Discovery may yield further charges.

### E.  <u>RELIEF WANTED</u>

WHEREFORE, **Plaintiffs demand judgement against Defendants individually, jointly, and severally in an amount in excess of $300,000 plus costs, disbursements, reasonable attorney fees, interest, and awarding whatever other relief the Court deems just and equitable.**

Plaintiffs as Trustee for hereby prays and for an order of the Court as follows:

1.    Adjudging that Defendants are liable to Plaintiffs Laura A. Rapp and Laura A. Rapp, former personal representative, for their actual damages in an amount that will be proven at trial;

2.    Awarding such other relief as the Court may deem just and equitable.

## E. JURY DEMAND

Plaintiffs want a jury to hear their case.

Dated this 25th day of December 2017.
  Respectfully Submitted,
        /s/Laura A. Rapp_____
        Plaintiff Laura A. Rapp
        512-563-9135
        laurarapp61@gmail.com
        144 Corte Anita, Greenbrae, California  94904

        /s/Laura A. Rapp
        Plaintiff Laura A. Rapp, Former Personal Representative of the
        Laurence A. Berg Estate
        512-563-9135
        laurarapp61@gmail.com
        144 Corte Anita, Greenbrae, California  94904

REQUEST TO PROCEED IN DISTRICT COURT WITHOUT PREPAYING THE
FILING FEE
☑  I  DO NOT request that I be allowed to file this complaint without prepaying the
filing fee under 28 U.S.C. § 1915, and I have included the full filing fee with this
complaint.

Dated: December 25, 2017

                              By: /s/ Laura A. Rapp_____
                                  laurarapp61@gmail.com
                                  144 Corte Anita
                                  Greenbrae, CA  94904
                                  Telephone: 512-563-9135

                        **PRO SE REPRESENTATIVE**


                        **ACKNOWLEDGMENT**

        The undersigned hereby acknowledges that costs, disbursements, and
reasonable attorney's fees may be awarded pursuant to Wis. Stat. § 814.03 to the
parties against whom the allegations in this pleading are asserted.

Dated this 25th day of December, 2017      __/s/ Laura A. Rapp_____

                                  Laura A. Rapp